LATHAM & WATKINS LLP
  Paul H. Dawes (Bar No. 55191)
    paul.dawes@lw.com
140 Scott Drive
Menlo Park, California 94025
Telephone: (650) 328-4600
Fax: (650) 463-2600

LATHAM & WATKINS LLP
  Charles W. Cox (Bar No. 162854)
    chuck.cox@lw.com
  Michelle J. Correll (Bar No. 229488)
    michelle.correll@lw.com
  Ryan D. White (Bar No. 255201)
    ryan.white@lw.com
355 South Grand Avenue
Los Angeles, California 90071
Telephone:  (213) 485-1234
Facsimile:  (213) 891-8763

Attorneys for Defendant The Cooper
Companies, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| IN RE COOPER COMPANIES INC., SECURITIES LITIGATION | CASE NO. SACV 06 00169 CJC (RNB)<br><br>**DEFENDANT THE COOPER COMPANIES, INC.'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT RE LOSS CAUSATION (INVENTORY AND SALES FORCE INTEGRATION CLAIMS)**<br><br>Hearing:<br><br>Date:  April 20, 2009<br>Time:  1:30 p.m.<br>Court:  Hon. Cormac J. Carney<br><br>Discovery Cutoff:  Oct. 16, 2009<br>Pretrial Conference Date: Jan. 18, 2010<br>Trial Date:  Feb. 17, 2010 |

LATHAM&WATKINS LLP  LA\1956347.3
ATTORNEYS AT LAW
LOS ANGELES

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW ISO MSJ (INVENTORY AND SALES
FORCE INTEGRATION CLAIMS)

Pursuant to Local Rule 56-1, Defendant The Cooper Companies, Inc. ("Cooper") hereby submits the following Statement of Uncontroverted Facts and Conclusions of Law in support of its Motion for Summary Judgment Re Loss Causation (Inventory and Sales Force Integration Claims), filed concurrently herewith.

## I.    STATEMENT OF UNCONTROVERTED FACTS

| No. | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| Ocular Sciences, Inc. Statements | | |
| 1. | On May 4, 2004, Ocular Sciences, Inc. ("Ocular") filed a Form 8-K with the United States Securities and Exchange Commission ("SEC"). | White Decl., Ex. 1. |
| 2. | The May 4, 2004 Ocular Form 8-K included a press release dated May 4, 2004 as an Exhibit to the Form 8-K. | White Decl., Ex. 1 at 5-14. |
| 3. | The May 4, 2004 Ocular press release contained the following statement attributed to Stephen J. Fanning:<br><br>"We will be launching a new specialty sphere product late in the second quarter with a great deal of marketing support . . . . Our U.S. two week disposable spherical lens sales were down in the quarter as customers, especially those with proprietary brands, started to reduce their inventories in advance of the new product launch." | White Decl., Ex. 1 at 7. |
| 4. | On May 4, 2004, Stephen J. Fanning was the President and Chief Executive Officer of Ocular. | White Decl., Ex. 1 at 6. |

| 5. | On May 4, 2004, Ocular held a conference call with investors and analysts. | White Decl., Ex. 2. |
|---|---|---|
| 6. | The transcript from the May 4, 2004 Ocular conference call contains the following statement attributed to John Fruth:<br><br>"We give up the upside of inventory build in the marketplace, and we're feeling a little bit of that right now as customers are taking their inventories down. But in the long run it, like I say, it makes for a more defensible business." | White Decl., Ex. 2 at 24. |
| 7. | On May 4, 2004, John Fruth was the Chairman of the Board of Directors of Ocular. | White Decl., Ex. 2 at 16. |
| 8. | On May 10, 2004, Ocular filed a Form 10-Q with the SEC. | White Decl, Ex. 3. |
| 9. | The May 10, 2004 Ocular Form 10-Q contained the following statement:<br><br>"U.S. sales were $31.1 million in the first quarter of 2004, a 3.4% decrease from the first quarter of 2003. This decrease is primarily due to a continued decline in sales of our conventional reusable product line and lower sales of disposable spheres as we believe customers began reducing their inventories in advance of our second quarter launch of a new sphere product." | White Decl., Ex. 3 at 56. |
| 10. | On June 28, 2004, Ocular issued a press release announcing the launch of the Biomedics 55 Premier contact lens. | White Decl., Ex. 4. |

LATHAM&WATKINS LLP   LA\1956347.3                          2
ATTORNEYS AT LAW
LOS ANGELES

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW ISO MSJ (INVENTORY AND SALES
FORCE INTEGRATION CLAIMS)

| | | |
|---|---|---|
| 11. | On July 29, 2004 Ocular filed a Form 8-K with the SEC. | White Decl., Ex. 5. |
| 12. | The July 29, 2004 Form 8-K included a press release dated July 28, 2004 as an Exhibit to the Form 8-K. | White Decl., Ex. 5 at 79-89. |
| 13. | The July 28, 2004, press release contained the following statement:<br><br>"The Company's expectation is for revenue growth of 7 to 8% on a constant currency basis in the second half of 2004. The Company's growth rate in 2004 is based upon the experience in the second quarter with customers managing down their existing inventories in advance of the aspheric Biomedics 55 Premier launch." | White Decl., Ex. 5 at 82. |
| 14. | On August 6, 2004, Ocular filed a Form 10-Q with the SEC. | White Decl., Ex. 6. |
| 15. | The August 6, 2004 Ocular Form 10-Q contained the following statement:<br><br>"U.S. sales were $33.6 million and 64.7 million for the three and six months ended June 30, 2004, a 0.3% increase and 1.5% decrease over the same periods last year. The results are primarily due to a continued decline in sales of our conventional reusable product line and lower sales of disposable spheres as we believe customers are reducing their inventories of our older sphere product as a result of our launch of our new sphere product, offset by growth in sales of disposable toric lenses." | White Decl, Ex. 6 at 114. |

LATHAM&WATKINS LLP    LA\1956347.3    3    STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW ISO MSJ (INVENTORY AND SALES FORCE INTEGRATION CLAIMS)

ATTORNEYS AT LAW
LOS ANGELES

| 16. | On September 30, 2004, Mr. Fanning presented at the UBS Global Life Sciences Conference. | White Decl., Ex. 7. |
| --- | --- | --- |
| 17. | The transcript from the September 30, 2004 UBS Global Life Sciences Conference contains the following statement attributed to Mr. Fanning:<br><br>"So, we've taken our existing lens. This isn't an incremental SKU. We're in the process in the second and the third quarter in the U.S. of launching this product.  We are replacing our spherical product, our original spherical product, with this product.  Consequently, many of our retailers are basically taking down their inventories to prepare for this launch.  We did that in the second quarter with many retailers.  We're doing it now, finishing it up in the third quarter and, pretty much in the fourth quarter, we should be in good shape, with all of our retailers having our new product." | White Decl., Ex. 7 at 153. |
| 18. | On November 9, 2004, Ocular filed a Form 10-Q with the SEC. | White Decl., Ex. 8. |
| 19. | The November 9, 2004 Ocular Form 10-Q contained the following statement:<br><br>"U.S. sales were $36.0 million and $100.7 million for the three and nine months ended September 30, 2004, a 1.1% increase and 0.6% decrease over the same periods last year, respectively.  These results are primarily due to a continued decline in sales of our conventional reusable product line and lower sales of disposable spheres as we believe customers are reducing their inventories of our older sphere product as a result of our launch of our new sphere product, offset by growth in sales of disposable toric lenses." | White Decl., Ex. 8 at 178. |

LATHAM&WATKINS LLP    LA\1956347.3

ATTORNEYS AT LAW
LOS ANGELES

4

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW ISO MSJ (INVENTORY AND SALES
FORCE INTEGRATION CLAIMS)

| | The Cooper Companies, Inc. Statements | |
|---|---|---|
| 20. | On July 29, 2004, Cooper and Ocular held a conference call with investors and analysts. | White Decl., Ex. 9. |
| 21. | The transcript from the July 29, 2004 conference call contains the following question and answer:<br><br>**"Unidentified Speaker**<br><br>Yes, that makes sense. Hey, last question, and, John, I'm less familiar with your guys kind of pipeline and forecast, but one thing I did pick up, just looking at the numbers, was you grew about 5% constant currency the first half of this year, and the consensus revenue estimates for you all, for Ocular, for '05 and '06, and I think in this guidance here, as well, you're giving us, it's kind of more in the 10%, 11% range. Can you just characterize where that acceleration comes from in the business?<br><br>**John Fruth – Ocular Sciences – Director**<br><br>Well, I think that if you look at where Ocular is today, we've got a pipeline of products that are just coming. We mentioned some of them in Japan. We just launched the Aspheric weekly disposable in the U.S. It's getting great reception. A multifocal coming, as well as another two-week disposable product; the U.S., we are just starting to launch daily disposables; and we got the silicone hydrogel coming next year. So the growth side of it is coming from a new product pipeline that gives us a real opportunity to participate in new markets as well. | White Decl., Ex. 9 at 209. |

| | | |
|---|---|---|
| | **Tom Bender – Cooper Companies – CEO**<br><br>Tom, can I answer it even another way. If you look at Ocular's performance, I think you'll flash on very quickly that their international business is growing very well. A lot of that is Japan as well as Europe. Where they're getting hurt is in the U.S., as we see that. But remember what Ocular used to be -- Ocular was a commodity disposable [seer] business, and there's no doubt we're kicking their butt a little bit and Advantage was, you know, Acuvue Advantage was hurting them a little bit, and they were a little slow, and they've done very well with their new specialty products, but what they really did in the last six months, I think, has been very smart, and that is they moved their new product, which is -- it's a premier-designed [seer]. It's not what I would call a commodity, and what they're trying to do is move those patients that are on the old Bio Medics product into this better product. To do that effectively, they took a step back, and it's hurt their sales this year, because they sure as hell didn't have 5% constant currency last year. It's only the first six months of this year. With the strategy that they said they would do so they wouldn't have a lot of overlap of inventory. So what they did is they allowed that inventory of the old product to decline as they built this new product in. So we looked at that pretty strongly, too, to make sure we didn't have a hurt hunter, here -- somebody's lost a leg. They haven't lost a leg, it was part of their strategy." | |
| 22. | On July 29, 2004, Tom Bender was the Chairman of the Board of Directors and Chief Executive Officer of Cooper. | White Decl., Ex. 9 at 199. |

ATTORNEYS AT LAW<br>LOS ANGELES

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW ISO MSJ (INVENTORY AND SALES
FORCE INTEGRATION CLAIMS)

| | | |
|---|---|---|
| 23. | On December 13, 2004 Cooper held a conference call with investors and analysts. | White Decl, Ex. 10. |
| 24. | The transcript from the December 13, 2004 conference call contains the following statement:<br><br>"As far as Ocular is concerned, now remember, Ocular in the first two quarters of this year purposely held back on distribution of their Biomedics, so they could manage their inventories down." | White Decl., Ex. 10 at 223. |
| 25. | On January 7, 2005, Cooper filed a Form 8-K with the SEC. | White Decl., Ex. 11. |
| 26. | The January 7, 2005 Form 8-K included a press release dated January 6, 2005 as an Exhibit to the Form 8-K. | White Decl., Ex. 11 at 343-344. |
| 27. | The January 6, 2005 press release announced that Cooper had closed its merger with Ocular. | White Decl., Ex. 11 at 343. |
| 28. | On March 9, 2005, Cooper held a conference call with investors and analysts. | White Decl., Ex. 12. |
| 29. | The transcript from the March 9, 2005 conference call contains the following statement attributed to Mr. Bender: | White Decl, Ex. 12 at 347. |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

"Anyway, let's give you, first of all, an update on the integration. Hopefully, you can see in our results for the quarter the integration is going on very, very well. We think the fact that we're ahead of the game at this point to give you a flavor for that.

We have announced that we will be closing and consolidating the Huntington Beach operations for our made-to-order contact lens business here in California into Rochester by the first of July. The West Coast customer service group here in Huntington Beach will be – those jobs will be replaced in Albuquerque, which was the customer service headquarters for Ocular Science that will now become our West Coast customer service group. The inside sales group here at – in California – those jobs have been eliminated, and the inside sales function now is in Arizona, and that was part of Ocular Science. The Albuquerque manufacturing made-to-order contact lens manufacturing will be – we'll begin to eliminate that plant by the middle of this year. Hopefully, we'll have it completely transferred to Rochester by the – within 12 months of the beginning of that closer. And the employees, I must tell you, are aware of it.

\* \* \* \* \*

We were somewhat delayed in the UK and France for 30 days for regulatory reasons for – to complete that integration and to get the – from the sales side, anyway – to get that completed as of the 1st of February, which was, I guess, about a month ago now. It is in process, so we feel very good about the integration and feel very optimistic going forward."

LATHAM&WATKINSLLP    LA\1956347.3

ATTORNEYS AT LAW
LOS ANGELES

8                    STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW ISO MSJ (INVENTORY AND SALES
FORCE INTEGRATION CLAIMS)

| | | |
|---|---|---|
| 30. | The transcript from the March 9, 2005 conference call contains the following statement attributed to Robert S. Weiss: | White Decl., Ex. 12 at 350. |

"Overall, the integration process – Tom, hit upon a number of the locations that we've taken steps -- Huntington Beach, Albuquerque, some relocation of our inside sales groups. The U.S. sales force has been fully integrated, and had its national sales meeting in early February, so we're really going [to] see the benefits from that point forward. In January, each sales guy -- Ocular and Cooper -- was pretty much calling on their accounts the way they did in the past and recording sales and soliciting orders as they did in the past. Only going forward into the second quarter do we see the benefits of that.

Countries like Canada and Australia were literally integrated from a sales force and a G&A perspective within the first week. So we're starting to see early benefits of that, but it would be an overstatement to say we're seeing much benefits from the integration in January, obviously, with only 3 1/2 weeks into it."

| | | |
|---|---|---|
| 31. | On March 9, 2005, Robert S. Weiss was the Executive Vice President and Chief Operating Officer of Cooper. | White Decl, Ex. 12 at 346. |
| 32. | The transcript of March 9, 2005 conference call contains the following statement attributed to Mr. Bender: | White Decl., Ex. 12 at 362. |

| | | | |
|---|---|---|---|
| | | "There is no doubt that we're going to have some disruption with both these sales force during this period of time, because of the delay of the close that we're doing." | |
| 33. | On March 29, 2005, Mr. Weiss presented at the Smith Barney Citigroup Healthcare Conference. | | White Decl., Ex. 13. |
| 34. | On May 6, 2005, Cooper filed a Form 8-K with the SEC. | | White Decl., Ex. 14. |
| 35. | The May 6, 2005 Form 8-K included a press release dated May 5, 2005 as an Exhibit to the Form 8-K. | | White Decl., Ex. 14 at 380-382. |
| 36. | The May 5, 2005 press release contained the following statement: "CooperVision revenue estimates for the second quarter have been reduced from a range of $195 million to $198 million to a range of $186 million to $188 million. The reduction results primarily from continuing sales force integration, territory realignment and training disruptions following the January 2005 acquisition of Ocular Sciences, Inc. and from continuing high inventory levels of Ocular Science's spherical contact lenses in trade channels in the United States that developed during the nine months prior to the close of the acquisition." | | White Decl., Ex. 14 at 380. |
| 37. | The May 5, 2005 press release filed with the SEC contains the following statement attributed to Mr. Bender: | | White Decl., Ex. 14 at 381. |

| | | | |
|---|---|---|---|
| 1 2 3 4 | | "I expect it will be at least six more months before this excess trade inventory of Ocular Sciences' spherical products returns to normal levels in the U.S. market." | |
| 5 6 | 38. | On June 7, 2005, Cooper filed a Form 8-K with the SEC. | White Decl., Ex. 15. |
| 7 8 9 | 39. | The June 7, 2005 Form 8-K included a press release dated June 7, 2005 as an Exhibit to the Form 8-K. | White Decl., Ex. 15 at 387-388. |
| 10 11 12 13 14 15 | 40. | The June 7, 2005 press release contained the following statement: "Revenue $215.8 million, 79% above the second quarter 2004, 75% in constant currency. . . . EPS 81 cents before nonrecurring acquisition and restructuring expenses, reported EPS 62 cents; . . . ." | White Decl., Ex. 15 at 387. |
| 16 17 18 19 20 21 22 23 | 41. | The June 7, 2005 press release contained the following statement: "As a result of these interest rate swaps not qualifying as a hedge, the Company is remediating its hedge accounting process. This failure to qualify for hedge accounting treatment may constitute a material weakness in internal control. Due to management's ongoing review, we may be delayed in filing our second quarter Form 10-Q." | White Decl., Ex. 15 at 387. |
| 24 25 26 27 28 | 42. | The June 7, 2005 press release contained the following statement: | White Decl., Ex. 15 at 387. |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

LA\1956347.3

11

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW ISO MSJ (INVENTORY AND SALES
FORCE INTEGRATION CLAIMS)

| | | "Cooper has revised revenue and earnings per share guidance for fiscal years 2005, 2006 and 2007 effective today. The update reflects recent changes in foreign currency rates and, for CVI's third quarter 2005 revenue guidance, adjustments for estimated inventory in trade channels." | |
|---|---|---|---|
| | **Third Party Reports** | | |
| 43. | The 2005 first quarter Health Products Research report was released on or about May 2, 2005. | | White Decl., Ex. 16. |
| 44. | PiperJaffray issued an analyst report on Cooper on May 3, 2005. | | White Decl., Ex. 17. |
| 45. | Baird U.S. Equity Research issued an analyst report on Cooper on May 3, 2005. | | White Decl., Ex. 18. |
| | **Cooper's Historical Common Stock Price** | | |
| 46. | On March 9, 2005, Cooper's common stock closed at $82.37. | | White Decl., Ex. 19. |
| 47. | On March 10, 2005, Cooper's common stock closed at $82.45. | | White Decl., Ex. 19. |
| 48. | On March 11, 2005, Cooper's common stock closed at $83.00. | | White Decl., Ex. 19. |
| 49. | On March 28, 2005, Cooper's common stock closed at $75.49. | | White Decl., Ex. 19. |

LATHAM&WATKINS LLP    LA\1956347.3

ATTORNEYS AT LAW
LOS ANGELES

12                    STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW ISO MSJ (INVENTORY AND SALES
FORCE INTEGRATION CLAIMS)

| 50. | On March 29, 2005, Cooper's common stock closed at $71.77. | White Decl., Ex. 19. |
|---|---|---|
| 51. | On May 2, 2005, Cooper's common stock closed at $62.60. | White Decl., Ex. 19. |
| 52. | On May 3, 2005, Cooper's common stock closed at $60.22. | White Decl., Ex. 19. |
| 53. | On May 4, 2005, Cooper's common stock closed at $58.75. | White Decl., Ex. 19. |
| 54. | On May 5, 2005, Cooper's common stock closed at $62.70. | White Decl., Ex. 19. |
| 55. | Cooper's common stock did not trade at or below $58.75 during regular trading hours after May 4, 2005 until November 22, 2005. | White Decl., Ex. 19. |
| 56. | On June 7, 2005, Cooper's common stock closed at $64.44. | White Decl., Ex. 19. |
| 57. | On June 8, 2005, Cooper's common stock closed at $61.15. | White Decl., Ex. 19. |

LATHAM&WATKINS LLP   LA\1956347.3

ATTORNEYS AT LAW
LOS ANGELES

13

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW ISO MSJ (INVENTORY AND SALES
FORCE INTEGRATION CLAIMS)

## II.    CONCLUSIONS OF LAW

### A.    Legal Standard

1.    Summary judgment is appropriate when the moving party demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317. 322-26 (1986).

2.    To prevail on their claims under § 10(b) of the 1934 Securities Exchange Act, Plaintiffs have the burden of proving: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, -- U.S. --, 128 S. Ct. 761, 768 (2008).

3.    To prevail on their claims under § 20(a) of the 1934 Securities Exchange Act, Plaintiffs have the burden of proving, *inter alia*, a primary violation of § 10(b). *Paracor Fin., Inc. v. General Electric Cap. Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996).

4.    In order to prove loss causation, a plaintiff must prove a "causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). To meet this burden, a plaintiff must first establish that the "relevant truth" was disclosed to the market and then show that the defendant's stock price dropped in response to that disclosure. *See id.* at 342, 347 (a plaintiff must show that the stock price "fell significantly after the truth became known"); *Metzler Investment GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008) (plaintiff must establish "that the practices that the plaintiff contends are fraudulent were revealed to the market and caused the resulting loss").

B.    **Plaintiffs' Inventory Claims**

5.    Plaintiffs cannot establish loss causation on their inventory claims because Cooper's stock price increased on May 5, 2005 following the alleged corrective disclosure. The failure of Cooper's stock price to react adversely to the alleged corrective disclosure precludes any finding of loss causation as to that disclosure. *See Dura*, 544 U.S. at 347 (plaintiffs must show that the stock price "fell significantly after the truth became known"); *Glaser v. Enzo Biochem, Inc.*, 464 F.3d 474, 477 (4th Cir. 2007); *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 175 (2d Cir. 2005); *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 945-47 (D. Ariz. 2007); *In re Impax Labs., Inc. Sec. Litig.*, 2007 U.S. Dist. LEXIS 723, at *18 (N.D. Cal. Jan. 3, 2007); *Ryan v. Flowserve Corp.*, 245 F.R.D. 560, 571 (N.D. Tex. 2007).

6.    Plaintiffs cannot establish loss causation based on statements made during Cooper's March 9, 2005 conference call. First, the fact that Cooper's stock price increased for two straight days following the March 9 conference call precludes a finding of loss causation. *See Dura*, 544 U.S. at 347; *Glaser*, 464 F.3d at 477; *Lentell*, 396 F.3d at 175; *Weiss*, 527 F. Supp. 2d at 945-47; *In re Impax Labs*, 2007 U.S. Dist. LEXIS 723, at *18; *Flowserve*, 245 F.R.D. at 571. Second, there is no evidence that Ocular's trade channel inventory during the first half of 2004 was discussed during the conference call. *See Metzler*, 540 F.3d at 1063 (the plaintiff must establish "that the practices that the plaintiff contends are fraudulent were revealed to the market and caused the resulting loss"); *In re Impac Mortgage Sec. Litig.*, 554 F. Supp. 2d 1083, 1102 n.13 (C.D. Cal. 2008) (J. Carney) (dismissal where plaintiffs "failed to plead facts showing that this decline in price was the direct result of any corrective disclosures pertaining to . . . statements regarding remedial measures or solid loan acquisition"); *Brodsky v. Yahoo! Inc.*, 2008 U.S. Dist. LEXIS 81549, at *37 (N.D. Cal. Oct. 7, 2008) ("Nowhere do Plaintiffs plead that these announcements contain statements by Yahoo! relating the revenue

1    decrease to false statements Yahoo! previously made about click fraud or Panama's

2    release."); *In re Dot Hill Sys. Corp. Sec. Litig.*, 2008 U.S. Dist. LEXIS 88791, at

3    \*36 (S.D. Cal. Sept. 2, 2008) ("the Court could find no disclosure of any

4    information concerning the" subject of the alleged prior misrepresentation).

5              7.    Plaintiffs cannot establish loss causation based on a decline in

6    Cooper's stock price after the Smith Barney Citigroup Healthcare Conference on

7    March 29, 2005 because there is no evidence that Cooper discussed Ocular's trade

8    channel inventory during the first half of 2004 at the conference. *See Metzler*, 540

9    F.3d at 1063; *In re Impac Mortgage*, 554 F. Supp. 2d at 1102 n.13; *Brodsky*, 2008

10   U.S. Dist. LEXIS 81549, at \*37; *In re Dot Hill*, 2008 U.S. Dist. LEXIS 88791, at

11   \*36.

12             8.    Plaintiffs cannot establish loss causation based on a decline in

13   Cooper's stock price following the release of the Health Products Research ("HPR")

14   report for the fist calendar quarter of 2005 because the HPR report does not provide

15   any information on inventory levels of Ocular products in the trade channels.  Thus,

16   the release of the HPR report cannot supply the missing causal link on Plaintiffs'

17   inventory claims. *See Dura*, 544 U.S. at 342; *Metzler*, 540 F.3d at 1063-64;

18   *Brodsky*, 2008 U.S. Dist. LEXIS 81549, at \*37; *In re Dot Hill*, 2008 U.S. Dist.

19   LEXIS 88791, at \*36.

20             9.    Plaintiffs cannot establish loss causation based on a stock

21   decline after Cooper announced its second quarter earnings on June 7, 2005.  These

22   statements do not provide the requisite causal link to Plaintiffs' alleged losses

23   because they do not reflect the introduction of new facts revealing the alleged falsity

24   of prior statements. *See Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 187 (4th

25   Cir. 2007) ("To allege loss causation in this case, plaintiffs would have to allege that

26   the market reacted to *new* facts disclosed in June 2003 that revealed [the

27   defendant's] previous representations to have been fraudulent.") (emphasis added);

28   *Apollo Group, Inc. Sec. Litig.*, 2008 U.S. Dist. LEXIS 61995, at \*12-17 (D. Ariz.

1   Aug. 4, 2008) (loss causation not established where corrective disclosure was not

2   the first to provide the fraud-revealing analysis); *Joffee v. Lehman Brothers, Inc.*,

3   410 F. Supp. 2d 187, 191 (S.D.N.Y 2006) (second disclosure of omitted information

4   "could [not] have caused the decline in Sunrise's stock price").

5        **C.**    **Plaintiffs' Sales Force Integration Claims**

6           10.    Plaintiffs cannot establish loss causation on their sales force

7   integration claims because Cooper's stock price increased on May 5, 2005

8   following the alleged corrective disclosure.  The failure of Cooper's stock price to

9   react adversely to the alleged corrective disclosure precludes any finding of loss

10   causation as to that disclosure.. *See Dura*, 544 U.S. at 347; *Glaser*, 464 F.3d at 477;

11   *Lentell*, 396 F.3d at  175; *Weiss*, 527 F. Supp. 2d at 945-47; *In re Impax Labs*, 2007

12   U.S. Dist. LEXIS 723, at *18; *Flowserve*, 245 F.R.D. at 571.

13           11.    Plaintiffs cannot establish loss causation based on a drop in

14   Cooper's stock price following the release of the 2005 first calendar quarter HPR

15   report because the HPR report does not provide any information on sales force

16   integration.  Thus, the release of the HPR report cannot supply the missing causal

17   link on Plaintiffs' inventory claims.  *See Metzler*, 540 F.3d at 1063-64; *In re Impac*

18   *Mortgage*, 554 F. Supp. 2d at 1102 n.13; *Brodsky*, 2008 U.S. Dist. LEXIS 81549,

19   at *37; *In re Dot Hill*, 2008 U.S. Dist. LEXIS 88791, at *36.

20           12.    The May 3, 2005 PiperJaffray and Baird analyst reports do not

21   constitute a corrective disclosure.  *See Metzler*, 540 F.3d at 1063-64; *In re Impac*

22   *Mortgage*, 554 F. Supp. 2d at 1102 n.13; *Brodsky*, 2008 U.S. Dist. LEXIS 81549,

23   at *37; *In re Dot Hill*, 2008 U.S. Dist. LEXIS 88791, at *36.  Moreover, both

24   reports were consistent with widely known and previously disclosed market

25   information. *See Teachers' Ret. Sys.*, 477 F.3d at 187; *Apollo*, 2008 U.S. Dist.

26   LEXIS 61995, at *12-17; *Joffee*, 410 F. Supp. 2d at 191.

27

28

LATHAM&WATKINSᴸᴸᴾ    LA\1956347.3

ATTORNEYS AT LAW
LOS ANGELES

17

STATEMENT OF UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW ISO MSJ (INVENTORY AND SALES
FORCE INTEGRATION CLAIMS)

1

**D.    Conclusion**

2        13.    Cooper is entitled to summary judgment on Plaintiffs' inventory

3  and sales force integration claims because, viewing the evidence in the light most

4  favorable to Plaintiffs and with all reasonable inferences drawn in favor of

5  Plaintiffs, there is no legally sufficient evidentiary basis for a reasonable jury to find

6  for Plaintiffs as to the existence of loss causation.  *See* Fed. R. Civ. P. 56; *Celotex*

7  *Corp. v. Catrett*, 477 U.S. 317. 322-26 (1986).

8        To the extent any uncontroverted fact is deemed a conclusion of law,

9  it is incorporated herein by reference as if set out in full.

10

11  Dated:  March 30, 2009              LATHAM & WATKINS
                                        Paul H. Dawes
12                                      Charles W. Cox
                                        Michelle J. Correll
13                                      Ryan D. White

14
                                        By  *Charles W. Cox/RDW*
15                                          Charles W. Cox
                                          Attorneys for Defendant
16                                        The Cooper Companies, Inc.

17

18

19

20

21

22

23

24

25

26

27

28

## PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California. I am over the age of 18 years and not a party to this action. My business address is Latham & Watkins LLP, 355 South Grand Avenue, Los Angeles, CA 90071-1560.

On **March 30, 2009,** I served the following document described as:

**DEFENDANT THE COOPER COMPANIES, INC.'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT RE LOSS CAUSATION (INVENTORY AND SALES FORCE INTEGRATION CLAIMS)**

by serving a true copy of the above-described document in the following manner:

### BY ELECTRONIC FILING

I electronically filed the above-described document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List.

### BY HAND DELIVERY

I am familiar with the office practice of Latham & Watkins LLP for collecting and processing documents for hand delivery by a messenger courier service or a registered process server. Under that practice, documents are deposited to the Latham & Watkins LLP personnel responsible for dispatching a messenger courier service or registered process server for the delivery of documents by hand in accordance with the instructions provided to the messenger courier service or registered process server; such documents are delivered to a messenger courier service or registered process server on that same day in the ordinary course of business. I caused a sealed envelope or package containing the above-described document and addressed as set forth below in accordance with the office practice of Latham & Watkins LLP for collecting and processing documents for hand delivery by a messenger courier service or a registered process server.

X. Jay Alvarez/Ryan Llorens
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-4208

### BY U.S. MAIL

I personally deposited a sealed envelope or package containing the above-described document and addressed as set forth below in a post office, mailbox, subpost office, substation, mail chute, or other like facility regularly maintained by the United States Postal Service for receipt of mail in Los Angeles, California, with postage thereon fully prepaid and served the following individuals (as shown on the attached Manual Notice List, with the exception of the names designated by an asterisk).

Bruce G. Vanyo
Katten Muchin
2029 Century Park East, Suite 2600
Los Angeles, CA 90067

Ramon Mendez Gonzalez
Milberg Weiss Bershad & Schulman
355 South Grand Ave., Suite 4170
Los Angeles, CA 90071-3172

I declare that I am employed in the office of a member of the Bar of, or permitted to practice before, this Court at whose direction the service was made and declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on **March 30, 2009**, at Los Angeles, California.

_____
Michelle Correll

LA\1960553.1

# Mailing Information for a Case 8:06-cv-00169-CJC-RNB

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **X Jay Alvarez**
  jaya@csgrr.com

- **Timothy J Burke**
  service@ssbla.com

- **Michelle J Correll**
  michelle.correll@lw.com

- **Charles W Cox , II**
  chuck.cox@lw.com,cathy.molina@lw.com

- **Paul H Dawes**
  paul.dawes@lw.com

- **Jordan Eth**
  jeth@mofo.com,nurbina@mofo.com

- **Michiyo M Furukawa**
  mfurukawa@milberg.com,schang@milberg.com,cchaffins@milberg.com

- **Geoffrey A Graber**
  ggraber@mofo.com,ppomerantz@mofo.com

- **Michele D Johnson**
  michele.johnson@lw.com,#ocecf@lw.com,jana.roach@lw.com

- **Ryan A Llorens**
  ryanl@csgrr.com

- **Judson E Lobdell**
  jlobdell@mofo.com,mblackmer@mofo.com

- **Eben O McNair , IV**
  emcnair@smcnlaw.com

- **Darren J Robbins**
  e_file_sd@csgrr.com

- **Karen T Rogers**
  krogers@milberg.com,schang@milberg.com,cchaffins@milberg.com

- **Stacey M Sprenkel**
  ssprenkel@mofo.com

- **Jeff S Westerman**
  jwesterman@milberg.com,schang@milberg.com,cchaffins@milberg.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Ramzi Abadou
Coughlin stoia Geller Rudman and Robbins
655 West Broadway, Suite 1900
San Diego, CA 92101-4297

David M Brodsky
Latham and Watkins
885 Third Avenue, Suite 1000
New York, NY 10022-4834

Ramon Mendez Gonzalez
Milberg Weiss Bershad and Schulman
355 South Grand Avenue, Suite 4170
Los Angeles, CA 90071-3172

William S Lerach
Coughlin Stoia Geller Rudman and Robbins
655 West Broadway, Suite 1900
San Diego, CA 92101

John Shin
Latham and Watkins
885 Third Avenue, Suite 1000
New York, NY 10022-4834

Bruce G Vanyo
Katten Muchin
2029 Century Park East    Suite 2600
Los Angeles, CA 90067
```