1  COUGHLIN STOIA GELLER
     RUDMAN & ROBBINS LLP
2  X. JAY ALVAREZ (134781)
   RYAN A. LLORENS (225196)
3  LAUREN G. KERKHOFF (236902)
   DARRYL J. ALVARADO (253213)
4  655 West Broadway, Suite 1900
   San Diego, CA  92101
5  Telephone:  619/231-1058
   619/231-7423 (fax)
6  jaya@csgrr.com
   ryanl@csgrr.com
7  lkerkhoff@csgrr.com
   dalvarado@csgrr.com
8
   Lead Counsel for Plaintiffs
9
   [Additional counsel appear on signature page.]
10

11            UNITED STATES DISTRICT COURT

12            CENTRAL DISTRICT OF CALIFORNIA

13                  SOUTHERN DIVISION

14

15 | In re COOPER COMPANIES, INC. | ) | No. SACV-06-00169-CJC(RNBx) |
   | SECURITIES LITIGATION | ) | |
16 | | ) | CLASS ACTION |
   | | ) | |
17 | This Document Relates To: | ) | PLAINTIFFS' STATEMENT OF |
   | | ) | GENUINE ISSUES OF MATERIAL |
   | ALL ACTIONS. | ) | FACT IN OPPOSITION TO THE |
18 | | ) | COOPER COMPANIES INC.'S |
   | | ) | MOTION FOR SUMMARY |
19 | | | JUDGMENT RE LOSS CAUSATION |
   | | | (INVENTORY AND SALES FORCE |
20 | | | INTEGRATIONS CLAIMS) |

21            DATE:    June 1, 2009
             TIME:    1:30 p.m.
22           CTRM:    9B
                      Hon. Cormac J. Carney
23

24

25

26

27

28

Pursuant to Local Rule 56-2, plaintiffs hereby submit the following Statement of Genuine Issues of Material Fact in Opposition to The Cooper Companies, Inc.'s Motion for Summary Judgment Re Loss Causation (Inventory and Sales Force Integration Claims).

## I.     INTRODUCTION

To prevail on a claim under §10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), plaintiffs have the burden of proving: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase price of the security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. Defendants have moved for summary judgment solely on the element of loss causation, as it relates to the inventory and sales force integration claims. The Cooper Companies Inc.'s ("Cooper") arguments are without merit.

## II.    PLAINTIFFS' GENUINE ISSUES OF MATERIAL FACT RELATING TO PLAINTIFFS' INVENTORY CLAIMS

1.     Cooper argues that "[p]laintiffs cannot establish loss causation on their inventory claims because Cooper's stock price increased on May 5, 2005 following the alleged corrective disclosure." Defendant The Cooper Companies, Inc.'s Statement of Uncontroverted Facts and Conclusions of Law in Support of Motion for Summary Judgment Re Loss Causation (Inventory and Sales Force Integration Claims) ("Defs.' Statement") at 15. Notwithstanding defendant's claim, the following evidence establishes a genuine issue of material fact:

- On May 2, 2005, the market share data regarding the contact lens industry that was released showed that Biomedics sales growth was faltering. Declaration of X. Jay Alvarez in Support of Plaintiffs' Statement of Genuine Issues of Material Facts in Opposition to Defendant The Cooper Companies, Inc.'s Motion for Summary Judgment Re Loss Causation (Inventory and Sales Force Integration Claims) ("Alvarez Decl."), Ex. 2, ¶83; *see also* Declaration of Ryan D. White in Support of Defendant The Cooper Companies, Inc.'s Motion for Summary Judgment Re Loss Causation (Inventory and Sales Force Integration Claims) ("White Decl."), Ex. 16;

- Professor Steven P. Feinstein opined that the market share data released on May 2, 2005 "showed that Cooper lost 0.8% market share of total new contact lens fits even though the Proclear line did very well. The data indicated that Cooper's standard two-week disposable lenses, which included the products Cooper acquired with Ocular, suffered a substantial market share loss. The Biomedics product line lost 21% of its market share, as measured by total patient visits, falling from a 7.7% share of the market to 6.1%. Measured in terms of new patient visits, Biomedics lost 14% of its market share, falling from 7.6% to 6.5%. In terms of total gross contact lenses sold, Biomedics lost 24% of its market share, falling from 5.8% to 4.4%." Alvarez Decl., Ex. 2, ¶83; *see also* White Decl., Ex. 16;

- Feinstein opined that on May 2, 2005, Cooper's stock declined $4.95 per share, or 7.6%, declining from $67.55 to $62.60. Alvarez Decl., Ex. 2, ¶87;

- Feinstein opined that for May 2, 2005, "[t]he residual return, isolating the impact of Company-specific information, was -7.74% (the market factor buoyed up the price of Cooper stock, which otherwise would have fallen even more due to the negative Company-specific news). The t-statistic associated with this residual return is -4.60, indicating that the large negative residual return is highly statistically significant." Alvarez Decl., Ex. 2, ¶237;

- Feinstein opined that "[w]ith its retail inventory excuse, the Company deflected blame for slowing Biomedics sales growth away from fundamental competitiveness. Had investors known that retail channel inventory was growing rather than falling in the months leading up to and following the merger, they would have known that past slowing sales correctly indicated the future slowing growth trend and that there was no good reason to forecast sudden acceleration. Had the Company been truthful about the retail inventory matter, investors would not have been as surprised in May 2005 when they learned of the market share loss suffered by Ocular's products, nor would they have been as surprised by subsequent poor sales results and revenue guidance reductions." Alvarez Decl., Ex. 2, ¶¶42, 84;

- On May 2, 2005, Wachovia issued an analyst report entitled "Industry Data Shows Share Gains By CIBA Vision," which published elements of the contact lens industry market share data. Alvarez Decl., Ex 4;

- The Feinstein deposition transcript from October 15, 2008 contains the following questions and answers regarding the May 2, 2005, Wachovia analyst report showing that the market was rattled by the market share data:

    Q [Cox].    So how do you square your testimony that you've given here today with the Wachovia analyst's report, for example, on May 2nd where it says "share shifts greatest in spherical DPR

- 2 -

segment. We believe CIBA gained nine points of new fits market share within the key two-week monthly disposable plan replacement, the DPR segment, spherical segment. Bausch & Lomb, BOL, share fell two points, and J&J lost eight points of unit share. Cooper reportedly gained one point in this segment as growth in its Proclear product offset losses in standard two-week lenses."

A [Feinstein]. Right. Well, what the analyst says and I believe it's elsewhere in the report is that it's not withstanding how well Proclear did. They would have done better. The point is Proclear would have gained more – the combined Cooper offering would have done better had it not been for the drag of Ocular is what he's saying there, so that's a metric that's used to evaluate whether the merger worked out or not.

Q [Cox]. But by definition then any performance by Ocular or Cooper that doesn't exactly mirror the forecast you would, you would find fault with?

A [Feinstein]. Well, find fault with, I don't know what you mean by find fault with. I mean, the problem is that Ocular was supposed to bring – what I mean by supposed to this is how it was pitched to the stockholders and to the investing public by management of Cooper. Ocular was supposed to bring strength in that segment, and in fact what they ended up doing according to that report, and according to the market share report, is they weighed down Cooper. Cooper would have done better in that segment as far as growth is concerned without Ocular and that's what worried and concerned and rattled is a good word, rattled the market.

Alvarez Decl., Ex. 3 at 189-90 (213:25-215:17).

• Feinstein opined that "[o]n 2 May 2005, the market learned, through the release of contact lens industry market share data and subsequent analyst earnings and valuation revisions, that Biomedics sales were faltering and dragging down sales growth for the entire Company. This disappointing news was contrary to Cooper's prior representations that Biomedics sales would accelerate after the merger as sales had been held back only by bloated retail channel inventory and that the inventory problem was sufficiently solved. The next day, several analyst reports discussed the surprising market share data and they accordingly reduced sales and earnings forecasts." Alvarez Decl., Ex. 2, ¶225;

• Feinstein further opined that "[t]he market share data partially corrected Defendants' misrepresentations that had inflated sales growth forecasts and in turn the stock price. When, at the start of

- 3 -

the Class Period, analysts raised concerns over the apparent incongruity between Ocular's past sales growth and the Company's projection for Ocular sales growth going forward, the Company gave the retail channel inventory story as an explanation for why future sales growth would be much greater than past sales growth. The new market share data indicated that fundamental weaknesses in Ocular's product line, not temporary inventory adjustments, were responsible for slowing sales. The market share data convinced analysts that the sales growth acceleration projected by the Company based on the inventory story and other misrepresentations would not be realized." Alvarez Decl., Ex. 2, ¶240;

- On May 3, 2005, Wachovia issued an analyst report on Cooper which contained the following statement: "2006 revenue targets do not consider the ongoing market shift to silicone hydrogels." Alvarez Decl., Ex 5 at 232;

- The May 3, 2005 Baird Equity Research ("Baird") analyst report contained the following statement regarding Cooper: "Given the sales force integration, market share, and silicone hydrogel issues discussed above, we feel it is currently appropriate to lower our top-line expectations for COO over the next several quarters." White Decl., Ex. 18 at 437;

- The May 3, 2005 Piper Jaffray analyst report contained the following statement regarding Cooper: "We believe this share loss may be related as much to the challenges of the merging COO and OCLR business as to the actual competitive environment." White Decl., Ex. 17 at 426;

- The May 3, 2005 Piper Jaffray analyst report also contained the following statement regarding Cooper: "Our conversations with management indicate that product cross-selling decisions and coordination of promotional campaigns are progressing, but will not be fully worked through until 2H05." Id.;

- The May 3, 2005, Wachovia, Baird and Piper Jaffray analyst reports discussed the market share data and each lowered their fiscal 2005 and 2006 revenue and earnings estimates for Cooper. Alvarez Decl., Ex. 5; White Decl., Exs. 17-18; Alvarez Decl., Ex. 2, ¶¶86, 233-236;

- Feinstein opined that on May 3, 2005, Cooper's stock declined an additional $2.38 per share, or 3.9%, closing at $60.22. Alvarez Decl., Ex. 2, ¶87;

- Feinstein opined that the total two-day decline for Cooper's stock for May 2, 2005 and May 3, 2005 was $7.33 per share, or 11.5%, declining from $67.55 to $60.22. Id.;

- Feinstein opined that "[t]he residual returns on May 3rd and May 4th were -3.90% and -3.97% respectively. Both negative returns were statistically significant, with associated t-statistics of -2.31 and -2.35, respectively." Alvarez Decl., Ex. 2, ¶238;

- • Feinstein opined that Cooper's stock price declined a total of $8.80, or 14%, from May 2nd through May 4th. Alvarez Decl., Ex. 2, ¶88;

- • Feinstein opined that "[t]he cumulative residual return over the three days from May 2nd through May 4th was -15.61%. The t-statistic for the cumulative 3-day return was -5.35%, which indicates that the 3-day price decline was highly statistically significant []. The probability that the 3-day price decline was caused by something other than Company news is only 1 in 50,000. The bad market share news caused the three-day price drop." Alvarez Decl., Ex. 2, ¶239;

- • With respect to Cooper's May 5, 2005 press release and Cooper's stock price on May 5, 2005, Feinstein opined that "[t]he bad news about top-line sales results received . . . by the marketplace over the previous three days was offset partially by the Company's excuses and good news about bottom-line earnings on 5 May 2005. That day, Cooper stock increased $3.95 per share, or 6.5%, from $58.75 to $62.70." Alvarez Decl., Ex. 2, ¶¶94, 244-250;

- • Feinstein opined that "[e]ven incorporating the offsetting stock price rise on May 5th, which was caused by the Company's reassuring announcement, the four-day price reaction to the release of the market share data on May 2nd was still negative, large, and statistically significant. The cumulative 4-day residual return was -8.95%, which has an associated t-statistic of -2.66 []. There is less than a 1% change that the 4-day cumulative price drop beginning on May 2 was caused by anything other than Company news. As noted, the primary news over this period was the poor market share results and all that they conveyed." Alvarez Decl., Ex. 2, ¶250;

- • Feinstein opined that "[w]hen a company makes an informationally corrective disclosure after-the-fact to explain poor performance that has already been reported, the economic impact of the prior misinformation may have already been removed from the stock price by the performance report before the formal explanation is offered by the company. On 2 May 2005, for example, a corrective disclosure took the form of a third-party industry market share report that was negative for Cooper. A few days later, the Company explained the poor market share results with statements that partially corrected some prior misrepresentations, but by then the stock price had already fallen." Alvarez Decl., Ex. 2, ¶51;

- • *See also* plaintiff's supplemental responses to Interrogatories Nos. 2 and 4. Alvarez Decl., Ex. 8 at 279-84; and

- • At the December 15, 2008 hearing on plaintiffs' motion for class certification, Cooper admitted that plaintiffs have pleaded loss causation vis-à-vis plaintiffs holding stock up to May 2, 2005. In an attempt to limit the class, counsel for Cooper stated that "there is no evidence which [plaintiffs] ha[ve] put in or can put in to show that somebody that's sold their stock *before* May 2 . . . there

is no way those people [who sold prior to the May 2, 2005 leakage] could show loss causation . . . So the class certification order which has to provide a reasonably ascertained – a class that can be reasonably ascertained should not include people that sold prior to May 2, 2005." Alvarez Decl., Ex. 7 at 270 (47:21-25, 48:1-6) (emphasis added).

2.     Cooper argues that "[p]laintiffs cannot establish loss causation based on statements made during Cooper's March 9, 2005 conference call." Defs.' Statement at 15.   Notwithstanding defendant's claim, the following evidence establishes a genuine issue of material fact:

- On March 9, 2005, Cooper issued a press release reporting its 1Q financial results. Alvarez Decl., Ex. 1;

- Feinstein opined that Cooper's March 9, 2005 results reflected disappointing revenue but also good news with respect to earnings.  Alvarez Decl., Ex. 2, at ¶78;

- Feinstein opined that "[t]he [Cooper] stock price rose modestly on March 10th and 11th, but then began an 11-day slide declining on each of those 11 days."  Alvarez Decl., Ex. 2, ¶260;

- Feinstein opined that "[t]he 11th day of the slide was 29 March 2005, the day Cooper presented at the Smith Barney Citigroup Healthcare Conference."  Alvarez Decl., Ex. 2, ¶261;

- Feinstein opined that "[a]n uninterrupted 11-day stock price slide is an extremely rare event. Assuming that without any Company-specific information a stock is as likely to rise as fall on any particular day, the probability of 11 consecutive days is less than 1 in 2,000 (0.0488%).  This result suggests that Company news precipitated the protracted stock price slide, as it could not have been a random event or caused by the market or peer group." Alvarez Decl., Ex. 2, ¶263;

- Plaintiff's supplemental responses outline why there exists loss causation as to the disclosure on this date. Alvarez Decl., Ex. 8 at 279-83, 285-86; and

- Alvarez Decl., Ex. 2, ¶¶259-265.

3.     Cooper argues that "[p]laintiffs cannot establish loss causation based on a decline in Cooper's stock price after the Smith Barney Citigroup Healthcare Conference on March 29, 2005 because there is no evidence that Cooper discussed Ocular's trade channel inventory during the first half of 2004 at the conference."

1    Defs.' Statement at 16.  Notwithstanding defendant's claim, the following evidence

2    establishes a genuine issue of material fact:

3          •    The March 29, 2005, transcript of Weiss at the Smith Barney
                Citigroup 2005 Healthcare Conference referred to a break-out
4               meeting to be held after the presentation, at which Weiss would
                answer analysts' questions.  The transcript attributes the following
5               statement to Weiss: "On that note, I think I have run out of time, I
                think we have covered in a nutshell Cooper.  I think we have a
6               breakout room there.  I will be happy to answer any questions in
                that break-out."  White Decl., Ex. 13 at 374;

7
          •    Feinstein opined that on March 29, 2005, the day of the Smith
8               Barney Citigroup 2005 Healthcare Conference, Cooper's stock
                price declined $3.72 per share, or 5.1%, from $75.49 to $71.77.
9               Alvarez Decl., Ex. 2, ¶81;

10         •    Feinstein opined that the March 29th stock price decline was
                statistically significant.  Alvarez Decl., Ex. 2, ¶261;
11
          •    Feinstein opined that "[f]rom 9 March 2005 through 29 March
12              2005, Cooper's stock price fell $10.60 from $82.37 per share to
                $71.77 per share.  Over the next month, the stock lost another
13              $4.22 per share."  Alvarez Decl., Ex. 2, ¶262;

14         •    Feinstein opined that "[a]t this point, however, with incomplete
                discovery, I do not have a complete record of what was discussed
15              at the 29 March 2005 conference, nor have I been able to identify
                Company communications or information disclosures over the
16              longer interval that may have triggered the protracted price
                decline out to 29 April 2005.  It is possible, and even likely such
17              information exists.  I may revisit this analysis as discovery
                progresses and documents and information become available that
18              may help attribute the stock price decline over this interval to
                specific factors."  Alvarez Decl., Ex. 2, ¶265;
19
          •    The transcript from Feinstein's deposition contains the following
20              questions and answers relating to the stock declines in March
                2005:
21
                        Q [Cox].  Okay.  You've indicated the March
22                  29th and the November 9th [March 9th] dates you'd
                    want to see investigation as to what you call
23                  semipublic information.  What other information did
                    you not, did you not, that's available that you did not
24                  have that might influence your opinion on market
                    efficiency?
25
                        A [Feinstein].    Well, I don't think this
26                  information would change my opinion about market
                    efficiency but it may be additional supportive
27                  information, which is why I would want to have the
                    information if possible.  But the Cooper stock price
28                  between March 9th, following March 9th all the way

                                    - 7 -

1    up to the trading day before May 2, 2005, I believe
      it's around 33 days in that period, fell a lot and it's a
2    33-day window that's statistically significant.  It's
      fairly rare to have a 33-day window with a
3    statistically significant price movement. I would – it
      would be helpful to know what information the
4    market was reacting to in that period of time.

5         Q [Cox].  This is in your report your 11-day,
      11-day drop?
6
         A [Feinstein].  Well, it's actually more than
7    11.  It's 11 days in a row that the stock price drops
      but it's 33 days between two public events that we
8    know about where there was a significant drop.

9         Q [Cox].   Well, did the market just not
      understand the information from the first event to the
10   second event?

11        A [Feinstein].  Well, I mean, I didn't draw
      conclusions about what was happening in that
12   middle period because I don't have all the
      information that the company has, for example.  I
13   didn't draw conclusions about it.  I just pointed out
      that it could be because of disclosures from the
14   company or disclosures from other sources that
      informed the market about something material or it
15   might not.  That's why it would be helpful to know.

16        Q [Cox].  Well, if there were disclosures by
      the company you would be able to see those
17   disclosures, correct?

18        A [Feinstein].  No.  I mean private disclosures
      or private communications or communications to
19   select investors or analysts.  I just don't know.

20   Alvarez Decl., Ex. 3 at 148-49 (49:1-50:25); and

21   •    *See* plaintiff's supplemental responses to Interrogatory Nos. 2 and
           4.  Alvarez Decl., Ex. 8 at 279-84.
22
23   4.    Cooper argues that "[p]laintiffs cannot establish loss causation based on a

24   decline in Cooper's stock price following the release of the Health Products Research

25   ('HPR') report for the first calendar quarter of 2005."  Defs.' Statement at 16.  As set

     forth in §II.1. above, a genuine issue of material fact exists as to this issue.
26
27   5.    Cooper argues that "[p]laintiffs cannot establish loss causation based on a

28   stock decline after Cooper announced its second quarter earnings on June 7, 2005."

- 8 -

*Id.* Notwithstanding defendant's claim, the following evidence establishes a genuine issue of material fact:

- In the June 7, 2005 press release issued by Cooper, Cooper reduced its revenue estimates for the second time in little over a month. White Decl., Ex. 15 at 387;

- On June 7, 2005 Cooper held a conference call with analysts and investors. Alvarez Decl., Ex. 6;

- The June 7, 2005 conference call transcript contained the following statement attributed to Bender:

> In the U.S., where we have our – our definite weakness, revenue ***weakness*** which we have stated before is related to the weakness in the two-week disposable Sphere product lines from Ocular Sciences . . . .
>
> *       *       *
>
> [T]he basic problem we're having with our two-week disposable Sphere is in the U.S. . . . [I]t's tied basically to a involvement with a large amount of inventory that we had been working off that developed over the year of 2004, as Ocular Science attempted to move Biomedics users from their old Biomedics product to Biomedics Premier, which is their spheric product. During that process, instead of working off of inventory of the old Biomedics product, they have actually begun to build excessive amount of inventory which of course, we have been working off.
>
> We do believe that by the end of this following quarter, third quarter, most of that inventory will be worked off.

*Id.* at 241-42 (emphasis added);

- The June 7, 2005 conference call transcript also contained the following exchange:

> Suey Wong – Robert W. Baird – Analyst
>
> Tom what is your level of confidence here in your current estimates of the excess inventory?
>
> Tom Bender . . . .
>
> My level of confidence, Bob certainly a lot higher than it was before. I don't want to make light of it, but it – we certainly believed that we have it right this time. . . . This is a U.S. issue and I think we

have now addressed it, and I feel much more confident than I have ever did.

\*       \*       \*

I mean, ***we knew we had a problem with sales***, with the Ocular's Biomedics.  We knew we had that problem. . . .

. . . [T]hey were trying to manage their inventory of Biomedic Spheres down, ***because*** they wanted to introduce Biomedics Premier and move without having a lot of returns coming back. . . .

I'm going to tell you apparently it wasn't executed too well . . . . [W]e thought we had a pretty good handle on how much ***excess*** inventory we had, and we started to mess around with our guidance. Because when you looked at the sales, we knew that the sales weren't going to come in but we knew exactly where it was.  We knew it exactly was the two-week products from Ocular Science and we knew it was in the U.S.  . . ."

*Id*. at 251, 254 (emphasis added);

- Feinstein opined that "notably, on this date, the Company disclosed explicitly that the Biomedics retail channel inventory levels were growing, not falling, in 2004, contrary to the statements made at the start of the Class Period.  Moreover, the Company disclosed that it had known for some time about problems with Biomedics sales, contradicting the representation at the start of the Class Period that Biomedics sales were poised to accelerate."  Alvarez Decl., Ex. 2, ¶255;

- Feinstein opined that following Cooper's announcement on June 7, 2005, the Cooper stock declined $3.29 per share, or 5.2%, declining from $64.44 to $61.15.  Alvarez Decl., Ex. 2, ¶99; and

- Feinstein opined that "the residual return following the announcement [on June 7, 2005] was -5.01%, with an associated t-statistic of -2.97.  The large and highly statistically significant negative stock price decline following this disclosure is evidence that the disclosures on 7 June 2005, which partially corrected Defendants' misrepresentations concerning the status of Ocular inventory in retail channels prior to the acquisition, caused investors to suffer losses."  Alvarez Decl., Ex. 2, ¶256.

## III.  PLAINTIFFS' GENUINE ISSUES OF MATERIAL FACT RELATING TO PLAINTIFFS' SALES FORCE INTEGRATIONS CLAIMS

1.    Cooper argues that "[p]laintiffs cannot establish loss causation on their sales force integration claims because Cooper's stock price increased on May 5, 2005

following the alleged corrective disclosure." Defs.' Statement at 17. Defendants are wrong for the reasons discussed above in §II.1. and for the additional following reasons which show the market interpreted the market share date to mean Cooper was experiencing sales force integration problems:

- Feinstein opined that the market share data "also indicated, according to analysts, that competitive pressure from competitors' silicon hydrogel lenses was formidable and expected to increase, and sales force integration problems likely impeded sales as well." Alvarez Decl., Ex. 2, ¶232;

- The transcript from Feinstein's deposition also contains the following questions and answers regarding the revelation of the sales force integration issues:

> Q [Cox]. Okay. So the corrective information regarding sales force integration comes out on May 5th, '05, correct?

> A [Feinstein]. Not precisely. On May 2nd is when the analysts – on May 2nd the analysts dropped their forecasts of revenue going forward and that's when the stock price fell. What happened on May 5th is the company chimed in with more color about the explanation for the downward revision and also followed the analysts by lowering their forecast for future sales results.

> *      *      *

> Q [Cox]. So the price impacted on May 23rd and fourth didn't have anything to do with a sales force integration problem?

> A [Feinstein]. It had everything to do with it.

> Q [Cox]. But I thought you said the market believed at that point based on Mr. Bender and Mr. Weiss' statements that the sales force integration weren't problems?

> A [Feinstein]. Well, actually, analysts searching for an explanation for the poor sales results offered as explanations silicone hydrogel competition and sales force integration problems, so basically they figured it out. They figured out that sales force integration was a problem. Then when – they figured it out. They said so. They said that we think the reason for this drop in market share and therefore for our drop in revenue forecast going forward and therefore the drop in the valuation of the

1    stock is, among other things, sales force integration.
      They figured it out.

2

3            And then that was confirmed three days later
      when the company said yeah, we're going to lower
      our forecast going forward as well and we're going

4    to offer as a reason sales force integration problems.
      So they figured it out.  They got it right and it was

5    confirmed that they got it right three days later by
      the company.

6
                        *       *       *
7

8            Q [Cox].  Generally it says about sales force
      integration.

9            A [Feinstein].   The impact of sales force
      integration problems was evident in the HPR data.

10
                        *       *       *
11

12           Q [Cox].  Well, how do you know they were
      writing down the forecasts for sales as opposed to
      Ocular inventory as opposed to training disruptions

13    as opposed to currency exchange or any of the other
      things that were referenced in the May 5th?

14
              A [Feinstein].  Because they said so.  They
15    said it was sales force integration problems.  They
      attributed the market share data or they attributed the

16    showing   that   was   indicated,   that   the   sales
      performance that was indicated by the market share

17    data to two things, competition from silicone
      hydrogel and sales force integration problems.  This

18    is the theme consistent in the analysts' reports
      following May 2nd.

19
                        *       *       *
20

21           Q [Cox].  I'm saying does it tell you whether it
      was – does it tell you whether the problems ended in
      January, ended in February or ended in March?

22

23           A [Feinstein].  Well, it tells you that they do
      not believe the problem ended because they were
      changing their forecasts going forward based on

24    sales force integration problems informed by the new
      market share data.

25
      Alvarez Decl., Ex. 3 at 213-16 (307:11-308:8, 309:8-310:12, 310:17-20,
26
      319:11-320:1, 320:13-21); and
27

28

                              - 12 -

1        •         For the reasons set forth in plaintiff's supplemental responses to
2                Interrogatories Nos. 2, 6 and 7. Alvarez Decl., Ex. 8 at 279-83, 286-86.

3         2.       Cooper argues that [p]laintiffs cannot establish loss causation based on a

4 drop in Cooper's stock price following the release of the 2005 first calendar quarter

5 HPR report because the HPR report does not provide any information on sales force

6 integration. Defs.' Statement at 17. Cooper is wrong for the reasons discussed above

7 in §II and for the additional following reasons set forth in §III.1.

8         3.       Cooper argues that plaintiffs cannot establish loss causation because

9 "[t]he May 3, 2005 Piper Jaffray and Baird analyst reports do not constitute a

10 corrective disclosure." *Id.* Cooper is wrong for the reasons set forth above in §III.1.

11 and for the additional following reasons:

12       •         On May 2, 2005, market share data was released that showed that
13               Biomedics sales were faltering and dragging down Cooper sales growth;

14       •         The following day, on May 3, 2005, Piper Jaffray and Baird
15               issued reports commenting on the data and lowered their fiscal 2005 and 2006 revenue and earnings estimates for Cooper.
16               Cooper's stock was hit hard by these revelations, falling $4.95 per share on May 2, 2005 on the data and $2.38 per share on May 3,
17               2005 on the analyst reports. White Decl., Exs. 17-18; Alvarez Decl., Ex. 5;

18       •         The May 3, 2005 Piper Jaffray report stated: "[w]e have updated
19               our forward estimates to reflect the most recent market share data and a thorough review of our assumptions relative to the OCLR
20               integration." White Decl., Ex. 17 at 426; and

21       •         The May 3, 2005 Baird report stated: "[g]iven the sales force
22               integration, market share, and silicone hydrogel issues discussed above, we feel it is currently appropriate to lower our top-line expectations for COO over the next several quarters." White Decl., Ex. 18 at 437.

23
24         4.       Cooper also incorrectly argues that plaintiffs' sales force integration

25 allegations cannot establish loss causation regarding the March 9, 2005 statements.

26 Cooper is wrong for the reasons discussed above in §II.2. and also for the additional

27 following reasons:

28       •         Feinstein opined in his report that "[d]uring the March 9th
               conference call, the Company made the allegedly false statement

about sale force integration progressing smoothly." Alvarez Decl., Ex. 2, ¶75;

- The March 9, 2005 Cooper conference call transcript contains the following statements attributed to Bender and Weiss:

    Tom Bender . . . .

    *       *       *

    [L]et's give you, first of all, an update on the integration.  Hopefully, you can see in our results for the quarter the integration is going on very, very well.  We think in the fact that we're ahead of the game at this point . . . .

    *       *       *

    From a guidance standpoint, we certainly are reconfirming our prior guidance we gave . . . ."

    *       *       *

    Bob Weiss . . . .

    *       *       *

    And important to note is our gross margin at CooperVision came in at 66 percent, excluding the non-recurring items. . . . ***The U.S. sales force has been fully integrated***, and had its national sales meeting in early February, so we're really going [to] see the benefits from that point forward. . . . [G]oing forward into the second quarter do we see the benefits of that.

White Decl., Ex. 12 at 347-50 (emphasis added);

- The March 9, 2005 Cooper conference call transcript also contains the following exchange:

    Dan Purue . . . Analyst

    . . . First of all, if you sort of had to talk about what ***you*** expected to see in the integration versus what you haven't expected, what have been the positive surprises and some of the negative surprises . . . .

    Tom Bender . . . .

    . . . Can't think of any negatives. . . .

    . . . The integration of the sales teams . . . [t]he U.S. ***went*** beautifully well."

- 14 -

*Id.* at 352 (emphasis added).

- Feinstein opined in his report that "[i]n sum, the March 9th results, which included Ocular's performance only for the last 25 days of the quarter, modestly disappointed on revenue but were good news about earnings. The Company offered an excuse to explain away the revenue miss, and the Company's alleged misrepresentations about silicone hydrogel competition and sales force integration reassured investors." Alvarez Decl., Ex. 2, ¶78; and

- The transcript from Feinstein's deposition also contains the following questions and answers regarding the March 9, 2005 statements and sales force integration:

> Q [Cox]. I still don't understand how I could quantify what sales force integration is doing well means.
>
> A [Feinstein]. Well, what the analyst is requesting to know is whether this is an issue that they should be concerned about or that they should discount the stock price because of or whether it's going to negatively impact sales. I mean, it's, it's an open-ended question. It's an invitation to provide information about whether sales is going to, sales force integration will in some way prove to be a negative and he asked it point blank and the answer he got was no problem here.
>
> *          *          *
>
> Q [Cox]. Sure. Is it the case that the analysts looked at market information, growth rates, market shares and came to their, and actual results and came to their own conclusions about the forecast?
>
> A [Feinstein]. Well, you're asking what weight did they give to management's representations relative to weight they gave to their own independent investigations? Is that your question?
>
> Q [Cox]. Uh-hum.
>
> A [Feinstein]. It's hard to parse it out exactly, although based on financial economic theory and a careful reading of the analysts' reports and their opinions that they express, it's quite clear that they, that my conclusion is founded here. It's well-founded that they did accept those representations. They didn't question the representations to such an extent that they systematically had worse projections for future performance than did the company.

- 15 -

1    Q [Cox].  And did the analysts participated in
2    the conference call on March 9th of 2005 where
     there was a discussion of the sales force integration,
     can you point to any analysts' reports between
3    March 9th, following March 9, 2005 where the
     analysts changed their forecast as a result of any
4    statements made at that March 9, 2005 conference
     about sales force integration?

5
     A [Feinstein].  You're saying did anyone
6    increase their forecast going forward based on the
     representations made?  Is that what you're asking?

7
     Q [Cox].  Yes.
8
     A [Feinstein].  I didn't see that specifically but
9    I also didn't see anyone decreasing their forecasts on
     account of having heard what appeared to be true
10   that there were sales force integration problems, so
     this is a case of where an alleged misrepresentation
11   supported the price at an artificially inflated level
     rather than let the price fall to its true, fair,
12   fundamental level.

13   Q [Cox].  Did you see any indicia that the
     analysts kept their price up as a result of anything
14   said on March 9, 2005?

15   A [Feinstein].  Yes.

16   Q [Cox].  Regarding sales force integration?

17   A [Feinstein].  Yes.

18   Q [Cox].  And what was that, sir?

19   A [Feinstein].  Well, I mean, the news on
     March 9th, of course – there was a substantial dose
20   of bad news on March 9th that was kind of
     countervailed by these representations of smooth
21   sales force integration and other items.  If it hadn't
     been for those positive representations, one would
22   expect that the negative news would have had a
     negative impact.

23              *       *       *

24   Q [Cox].  Afternoon, Doctor Feinstein.  Home
25   stretch.

26   How did companies statements on March 9,
     2005 concerning sales force integration inflate
27   investors' expectations of company's future sales
     and earnings?

28

1     A [Feinstein].  Well, assuming that there were problems with sales force integration at that time the concealment of those problems would be concealing negative news.  Negative news would have dropped the stock price.  The concealment of the problem kept the stock price up artificially.

2

3

4              *       *       *

5     Q [Cox].  How do you measure the inflation attributed to a false statement?

6

7     A [Feinstein].  Well, what I tend to do is I read carefully the news that's coming out about the company and analysts' commentary and company statements and look for dissemination of information that relates to the subject matter of the alleged misrepresentations and then check to see if there was a significant stock price reaction upon the entry into the market of the corrective information.

8

9

10

11     Alvarez Decl., Ex. 3 at 205, 209, 213 (276:21-277:10, 291:13-293:23,

12     306:15-25, 307:11-21).

13  DATED:  April 27, 2009          COUGHLIN STOIA GELLER
                                      RUDMAN & ROBBINS LLP
14                                  X. JAY ALVAREZ
                                    RYAN A. LLORENS
15                                  LAUREN G. KERKHOFF
                                    DARRYL J. ALVARADO
16

17

18                                  _____
                                         s/ X. JAY ALVAREZ
19                                       X. JAY ALVAREZ

20                                  655 West Broadway, Suite 1900
                                    San Diego, CA  92101
21                                  Telephone:  619/231-1058
                                    619/231-7423 (fax)

22                                  Lead Counsel for Plaintiffs

23                                  SCHWARZWALD McNAIR
                                      & FUSCO LLP
24                                  EBEN O. McNAIR
                                    616 Penton Media Building
25                                  1300 East Ninth Street
                                    Cleveland, OH  44114-1503
26                                  Telephone:  216/566-1600
                                    216/566-1814 (fax)

27

28

- 17 -

1

2          ZAUSMER, KAUFMAN, AUGUST
             & COLDWELL, P.C.
3          MARK J. ZAUSMER
           31700 Middlebelt Road, Suite 150
4          Farmington Hills, MI  48334-2374
           Telephone:  248/851-4111
5          248/851-0100 (fax)

6          Additional Counsel for Plaintiffs

7   S:\CasesSD\Cooper 06\stmt00059160.doc

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF SERVICE

1

2          I hereby certify that on April 27, 2009, I electronically filed the foregoing with

3    the Clerk of the Court using the CM/ECF system which will send notification of such

4    filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and

5    I hereby certify that I have mailed the foregoing document or paper via the United

6    States Postal Service to the non-CM/ECF participants indicated on the attached

7    Manual Notice List.

8          I certify under penalty of perjury under the laws of the United States of America

9    that the foregoing is true and correct.  Executed on April 27, 2009.

10
                                    s/ X. JAY ALVAREZ
11                                  X. JAY ALVAREZ

12                                  COUGHLIN STOIA GELLER
                                        RUDMAN & ROBBINS LLP
13                                  655 West Broadway, Suite 1900
                                    San Diego, CA  92101-3301
14                                  Telephone:  619/231-1058
                                    619/231-7423 (fax)
15

16
                                    E-mail: jaya@csgrr.com
17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 8:06-cv-00169-CJC-RNB

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **X Jay Alvarez**
  jaya@csgrr.com

- **Timothy J Burke**
  service@ssbla.com

- **Michelle J Correll**
  michelle.correll@lw.com

- **Charles W Cox , II**
  chuck.cox@lw.com,cathy.molina@lw.com

- **Paul H Dawes**
  paul.dawes@lw.com

- **Jordan Eth**
  jeth@mofo.com,nurbina@mofo.com

- **Michiyo M Furukawa**
  mfurukawa@milberg.com,schang@milberg.com,cchaffins@milberg.com

- **Geoffrey A Graber**
  ggraber@mofo.com,ppomerantz@mofo.com

- **Michele D Johnson**
  michele.johnson@lw.com,#ocecf@lw.com,jana.roach@lw.com

- **Ryan A Llorens**
  ryanl@csgrr.com

- **Judson E Lobdell**
  jlobdell@mofo.com,mblackmer@mofo.com

- **Eben O McNair , IV**
  emcnair@smcnlaw.com

- **Darren J Robbins**
  e_file_sd@csgrr.com

- **Karen T Rogers**
  krogers@milberg.com,schang@milberg.com,cchaffins@milberg.com

-20-

- **Stacey M Sprenkel**
  ssprenkel@mofo.com

- **Jeff S Westerman**
  jwesterman@milberg.com,schang@milberg.com,cchaffins@milberg.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Ramzi Abadou**
Coughlin stoia Geller Rudman and Robbins
655 West Broadway, Suite 1900
San Diego, CA 92101-4297

**David M Brodsky**
Latham and Watkins
885 Third Avenue, Suite 1000
New York, NY 10022-4834

**Ramon Mendez Gonzalez**
Milberg Weiss Bershad and Schulman
355 South Grand Avenue, Suite 4170
Los Angeles, CA 90071-3172

**William S Lerach**
Coughlin Stoia Geller Rudman and Robbins
655 West Broadway, Suite 1900
San Diego, CA 92101

**John Shin**
Latham and Watkins
885 Third Avenue, Suite 1000
New York, NY 10022-4834

**Bruce G Vanyo**
Katten Muchin
2029 Century Park East   Suite 2600
Los Angeles, CA 90067

-21-